# IN THE COURT OF CRIMINAL APPEALS OF TEXAS ORDER ADOPTING SUMMARY SHEET.

## FOR POST-CONVICTION APPLICATIONS FOR

### WRIT OF HABEAS CORPUS - SUPPLEMENTAL CLERK'S RECORD – DEATH PENALTY

Ex Parte GAMBOA,
JOSEPH Name of Applicant)

Application for Writ of Habeas Corpus
from BEXAR County
D379 Court

## TRIAL COURT WRIT NO. 2005CR7168A-W1

## CLERK'S SUMMARY SHEET

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 08 2015

Abel Acosta, Clerk

APPLICANT'S NAME: JOSEPH GAMBOA
(As reflected in judgment)
OFFENSE: CAPITAL MURDER - OTHER FELONY
(As reflected in judgment)
CAUSE NO: 2005CR7168A
(As reflected in judgment)
PLEA: GUILTY X NOT GUILTY ___NOLO CONTENDERE
SENTENCE: DEATH        DATE: MARCH 8, 2007
(Terms of years reflected in judgment)
TRIAL DATE: FEBRUARY 23, 2007
JUDGE'S NAME: BERT RICHARDSON
(Judge presiding at trial)
APPEAL NO:_____
(If applicable)
CITATION TO OPINION:____S.W.3d_____
(If applicable)
HEARING HELD:____YES_____NO
(Pertaining to the application for writ of habeas corpus)
FINDINGS & CONCLUSIONS FILED: X YES_____NO
(Pertaining to the application for writ of habeas corpus)
RECOMMENDATION: ___GRANT___DENY___DISMISS
(Trial court's recommendation regarding application for writ of habeas corpus) JUDGE'S NAME: BERT RICHARDSON
(Judge presiding over habeas corpus proceeding)
NAME OF COUNSEL IF APPLICANT IS REPRESENTED:_____

## NO. <u>2005CR7168A-W1</u>

# SUPPLEMENTAL WRIT INDEX

CAPTION ...........................................................................................................................0

REPORTER'S RECORD
VOLUME 5 OF 6 VOLUME (S)
APPLICATION FOR POST-CONVICTION HABEAS CORPUS (PG 39-120) .............. 1-82

CERTIFICATE.................................................................................................................83

# CAPTION

THE STATE OF TEXAS      *

COUNTY OF BEXAR        *

     At a regular term of the 379TH Judicial District Court of Bexar County, Texas, begun and held at San Antonio, State of Texas, before the Honorable BERT RICHARDSON Presiding thereof, which opened on the 1ST day of JANUARY A.D., 2015, and will adjourn on the 28TH day of FEBRUARY A.D., 2015, the following cause came on for trial, to-wit:

NO. 2005CR7168A-W1

EX PARTE: GAMBOA, JOSEPH

VS

THE STATE OF TEXAS

****************

Q    Now, your mitigation expert did not testify at trial, I believe.

A    Linda Mockridge did not testify.

Q    Okay. And that's pretty much the protocol, you use them as kind of a support team and they're, generally, not going to testify, you get other people to testify for you; is that correct?

A    Yeah. I think that's been certainly -- let me just think for a second. Certainly, Ms. Mockridge didn't testify in this trial. I'm trying to think if I've ever had a mitigation expert testify in other trials and I don't believe I have.

I think, you know, whatever mitigation they uncover, I think it's -- we either try to put on some family to support it or -- or, if we had the actual records from Child Protective Services, I think we probably offered those through the appropriate custodian and then had Ms. Milam consider those in her -- in giving some background on this young man.

Q    Very good.

MR. LANGLOIS:  I don't have any further questions.

THE COURT:  Anything else?

BY MS. WELSH:

Q    Just one last question, just to clear up on this

Dr. Milam thing. In fact, other than a statement that she makes in her affidavit, that says something about brain damage, at trial she actually testified that he is not mentally retarded, not doing well, it is not from a brain injury, like an accident of some kind, but more genetic.

Does that sound familiar?

A    Yeah. That's -- you know, I think that's -- that was more the -- the theme and that certainly supported, I think, the evidence that we were -- that we were trying to put on.

MS. WELSH: I have nothing further, your Honor.

THE COURT: Anything else?

MR. LANGLOIS: I have no further questions.

THE COURT: Okay. Mr. Hancock, this question has come up in the last two Writs I have done here in Bexar County: In your career, have you had anybody acquitted of murder or capital murder charges?

THE WITNESS: Well, the answer to that question is "yes," your Honor. I've had -- I represented a young man years ago in the 290th District Court that was found not guilty of capital murder.

And I certainly have had multiple cases where I represented people that are charged with murder and they have been found not guilty by juries, as well.

THE COURT: Was that capital case a death penalty case?

THE WITNESS: It was not. It was -- it was -- even predated life without parole. It was just a life in prison case.

THE COURT: Okay. Anything else from either side?

MS. WELSH: No, your Honor.

THE COURT: Okay. Mr. Langlois?

MR. LANGLOIS: No.

THE COURT: Okay. All right. Thank you.

THE WITNESS: Thank you, judge.

And may I be excused for the entire time?

THE COURT: Yes, sir. Yeah.

Okay. Lunch?

MR. LANGLOIS: I would like to start with Dr. De France.

THE COURT: We can start right now and go for a few minutes, or if Dr. De France or anybody else is hungry we can go to lunch and start right after lunch, whatever you prefer. We started late, so it makes no difference to me.

Dr. De France, how are you doing?

MR. DE FRANCE: Fine, your Honor.

THE COURT: Do you want to start rolling? We can get your qualifications out. That'll probably take us

15 minutes, I think.

Come on up and have a seat.

(Whereupon, the Witness, Jon De France was
(called to the Witness stand.)

THE COURT:   Raise your right hand, please.
State your name.

MR. LANGLOIS:   Identify yourself, please.

THE WITNESS:   Jon F. De France.

(Whereupon, the Witness, Jon De France was
(sworn in by the Court.)

THE COURT:   Okay.   All right.   You can
proceed, Mr. Langlois.   If you want to just go ahead and get
started and you can find a logical breaking point.   I'm sure
he's going to be on the stand longer than ten or 15 minutes.

MR. LANGLOIS:   Okay.

THE COURT:   We can get some lunch and then
come back and finish after lunch.

JON DE FRANCE,

The witness, having been first duly cautioned and sworn to
tell the truth, the whole truth and nothing but the truth,
testified as follows:

DIRECT EXAMINATION

BY MR. LANGLOIS:

Q    Okay.   Dr. De France, would you give us your
professional background.

A    I'm a clinical neuropsychologist, licensed in the State of Texas. I'm a neuroscientist. So, I have a very -- I have a varied background.

Q    All right. And you were actually hired by Jay Brandon to do a examination of Mr. Gamboa; is that correct?

A    He -- he requested the examination, but he didn't hire us.

Q    Okay.

A    He --

Q    Okay. You were retained as an expert, I believe.

A    Pardon me?

Q    You're an -- you were an expert in the case? He asked you to be an expert --

A    'Yeah. He asked for us to do an evaluation.

Q    Okay. And tell us what you did for the examination.

A    Well, it was a little -- it was a little bit different, since Dr. Milam had already conducted an evaluation. So, my recollection is that Mr. Brandon wanted us to -- he came to his own conclusion there was something missing in the evaluation and he wanted us to kind of focus in on some of the areas that -- that, perhaps, were not sampled or not examined, and so we did that.

Q    Okay. So, you had the availability of Dr. Milam's work; is that correct?

A     Well, not originally.  We -- I remember reviewing her court testimony or a deposition, but I didn't get her raw data or the background until afterwards, after I finished and started the writing process --

Q     Okay.

A     -- but it was very useful after all.

Q     Let me ask you this:  Given what you observed from Dr. Milam's testimony and the tests that she conducted, did you design your evaluation for a specific purpose, other than what she did?

A     Yes.  We did.

Q     Okay.  And could you tell us what -- how you designed your evaluation -- your evaluation and what were the factors you took into consideration.

A     Well, in any kind of what -- any kind of a question when there's violence, we -- we look at the -- the task, in terms of what we consider drive factors versus control factors.

And what we were trying to do is -- what we want to do is -- is determine not guilt or innocence, of course, but determine the likelihood of -- of future violence, but also try -- try to explain -- and it's not -- not assuming guilt or innocence, but it is trying to explain how something might occur, how an action might occur.

Q     Okay.  Now, were you aware at the time that

ANGIE RANGEL JIMENEZ, CSR
(210) 288-0312

Dr. Milam, basically, focused on what the Halstead-Reitan batteries --

A    Yeah.  That was clear from what we read.

Q    And you're talking about drive versus control. Does that have anything to do with what's called the executive functioning portion of the brain?

A    Yes.  It does.  And we kind of reframe it for -- for a legal proceeding, in terms of a person's capacity for rational thinking and making rational decisions versus their capacity to conform to society's standards.

Q    Okay.

A    So, executive functions come into play there.  And also Reitan is a well accepted battery of tests, but it doesn't sample the critical tests.  Mr. Hancock mentioned this issue of MR, the question of MR.

If I may put an aside comment -- and I don't know about the legal standard for mental retardation -- but in terms of psychological standards, we look at -- not only at intelligence level, but you look adaptive behavior.

Q    All right.

A    And so -- so, there's two facets of that that need to be looked at for the MR determination.  And adaptive behavior is very much going into the quality of a person's executive functioning.

Q    Okay.  Now, the Halstead, the Reitan --

ANGIE RANGEL JIMENEZ, CSR
(210) 288-0312

A     Halstead-Reitan.

Q     -- do they, basically, focus upon the executive functioning or do they not?

A     They do not.  As a matter of fact, there's only one subtest of many that -- that samples executive functions in any -- in any way at all.  And I don't think that was given, actually, at least it wasn't in her -- it wasn't in her file that I had.

Q     So, basically, Jay Brandon had asked you to look at executive functioning elements of Mr. Gamboa?

A     Yes, that and -- of course, in order to -- to do that, we had to look at other functions as well.  Basically, the executive functions are the responsibility of the prefrontal cortex and they are involved in other functions as well.

So, one important set of functions for predicting antisocial behaviors is working memory.  So, we looked at that as well -- as well as attention.

Q     And you -- based upon examining Dr. Milam's testimony, did it appear to you that she had not concentrated on or not focused on the executive functioning at all in her testimony?

A     That's true.  She did not.

THE COURT:  What part did he say?

THE WITNESS:  Executive functioning.

THE COURT: Okay.

Q (MR. LANGLOIS) Okay. Now, why is that -- why did that appear to be important to you, in this case, on Mr. Gamboa?

A Well, executive functioning, the concept is a little complicated. But, basically, it -- it -- the executive functions are involved in sort of harmonizing the person's resources of the brain processes and trying to harmonize those with the man's situation, whether external or internal.

A way to think of it is sometimes people think about a CEO function, and I was thinking about how to describe it. One important executive function is the -- is the judgmental function, self-evaluation and judgmental, and the way the executive function is sort of like His Honor, in the sense that executive functions tend to be very deliberate, cautious, attentive, but they tend to be quite slow.

THE WITNESS: No offense, your Honor.

THE COURT: None taken.

Q (MR. LANGLOIS) The part of the brain that controls the executive functioning, is that a different part of the brain than the areas that Ms. Milam concentrated on?

A Yes.

Q And what part of the brain controls executive function?

A    The prefrontal cortex.

Q    Okay.  Now, Ms. Milam looked at certain issues, such as genetics, congenital, childhood, early childhood, maybe middle/late childhood, adolescence and other factors, perhaps.

Did you determine -- during your investigation, did you find any evidence of, like, repeated concussions, or anything like that, or a brain injury?

A    Well, if we progress in the evaluation, and that's the way we sort of structure the evaluation, how we kind of -- that was -- the framework that we used for -- for interpreting the results as an aggregate.

Q    Now, you prepared an affidavit --

A    Yes, sir.

Q    -- for Mr. Brandon?

A    Uh-huh.

Q    And within that affidavit, did you mention anything about traumatic brain injury?

A    Yes.

Q    Why did you mention that?

A    Well, the data that -- everything is data-driven and his -- the pattern of executive function weakness and also of the working memory weakness, were suggestive of -- of -- of concussions, perhaps repeated concussions.

Q    Okay.  Now, let me talk -- what is working memory?

A    Working memory, you can think of it as consciousness, but it has various components.  Working memory is sort of like a -- a operating space, a fan, a vessel, where all information comes from all the senses and from our memories and as sort of put together it's used for a guided -- guiding present and future behavior.

The -- the important thing about -- well, there are certain patterns of working memory to consider which are signals for -- for traumatic brain injuries, but the important thing is that -- to kind of realize is that the working memory is extremely important for a person being flexible in their thinking.

And a person who is defficient in working memory functions is -- it's not a matter of being of poor memory, which is one facet, but it's -- basically, a person is -- is kind of forced into stereotypical or kind of a rigid way of responding, rigid way of behaving oftentimes.

Q    Now, executive functioning is pretty essential to the issue of behavioral control; is that correct?

A    Yes.

Q    And that gets into the issue of violent, antisocial behavior?

A    Yes.  The literature is quite vast on that.  But the -- certainly, it is important for, you know, what used to be called psychoactive or sociopathic behaviors and

actions.

But, basically, it's the breaking mechanisms. It's the control mechanisms that keep -- that drives and keeps that in check.

Q Okay. Now, that was a situation of Joseph Gamboa. Obviously, he was charged with a violent crime; is that correct?

A Yes, sir.

Q And central to that, you felt that a thorough examination of the executive functioning needed to be done and was not done by Dr. Milam; is that correct?

A That's correct.

Q Okay. Did Ms. Milam assess working memory?

A No.

Q Okay. And working memory, does that bear on a person's capacity for making rational decisions?

A Yes. It does.

Q Okay. Now, the executive functioning, does that control a person's ability to make rational decisions and decision making?

A It is a -- it is a factor, yes.

Q Okay. Is it a critical factor?

A Well, the -- the way that we -- the way that we structure the evaluation, a person can be deficient in executive functioning to a great degree, but -- but -- they

may be able to think rationally, but their thinking has a certain characteristic to it. I don't know if that answers your question or not, but --

Q Okay. Now, you also did some evaluation and you had information about Joseph Gamboa's development and injuries and stuff like that; is that correct?

A Yes. We had --

Q You had to work up --

A Yeah. Dr. Milam did quite an extensive psychosocial history, so it's --

Q You also had available family history and stuff like that?

A Yes.

Q Interviews with different family members?

A From Dr. Milam's -- yeah, report and from her -- from her file.

Q What are the consequences of impaired executive functioning and working memory functioning?

A The consequences?

Q Yes.

A Well, that's only part of the equation, but the consequences by and large with those deficientcies, the person's going to be operating on a fairly concrete or literal level, they are going to be -- tend to be -- function fairly stereotypically, because the executive

functions are important for controlling our emotional responses.

People who have executive functioning weaknesses tend to be emotionally labile, tend to sometimes hyper-react, they tend to make bad decisions, they tend to be maladaptive, while -- you know, there's been classic studies for, you know, many years that -- showing that you can take a person and give them an IQ test and you can do a frontal lobotomy on them, separating executive functions and eliminating their control, and the person will do the same on the IQ test. And, in fact, sometimes they do better.

Q Okay.

A So, it's -- the -- the issue of intelligence is -- is -- is separate. But, yet -- but the executive functions, trying to put it simply, they -- they control how effective -- how effective they control the intelligence modules of the brain, if you will, but -- to kind of determine how effective a person is in negotiating their environment, how adaptive they are.

Q Now, you spent, like, three days examining Mr. Gamboa; is that correct?

A Yes.

Q And about 15 hours or more of time?

A Of actual testing, yes.

Q And you made some informal observations, you

started out with some informal observations, and I believe you observed some -- what you called echopraxia?

A    Yes.

Q    Can you explain what echopraxia is.

THE COURT:  Why don't we just -- it's about five after 12:00.  It sounds like this is going to get kind of deep.  It's probably a good time to stop and just get something to eat.

MR. LANGLOIS:  Okay.

THE COURT:  Okay.  Is that okay with everybody?

MR. LANGLOIS:  We can do that.

THE COURT:  Okay.  Come back at 1:15.

MR. LANGLOIS:  1:15?

THE COURT:  It's about five after 12:00 right now.

MR. LANGLOIS:  All right.

(Lunch recess from 12:05 p.m. to 1:28 p.m.)

THE COURT:  Okay.  We're back on the record. Dr. De France is still on the stand and everybody's had their --

MS. WELSH:  We have no Defendant.

THE COURT:  -- everybody's had their shot of caffeine, so -- correct?

THE WITNESS:  Yes, your Honor.

ANGIE RANGEL JIMENEZ, CSR
(210) 288-0312

THE COURT: So, I think we're good to go.

(Off the record.)

(Open court, Defendant present.)

THE COURT: Okay. Mr. Gamboa's back in the courtroom, so we can proceed.

Mr. Langlois, your Witness.

Q    (MR. LANGLOIS) Dr. De France, let me start this afternoon with -- do a comparison to what you did versus what Dr. Milam did.

Okay?

A    Okay.

Q    And you, obviously, had an opportunity to look at her results and her testimony and her affidavit, where she, basically, stated that she did her testing and found that Mr. Gamboa was severely impaired; is that correct?

A    Yes. But the caveat is that I didn't see her notes or her test results until after I finished my evaluation --

Q    Okay.

A    -- but I did read her deposition -- or, her notes.

Q    Okay. And I think her results's, basically, that Mr. Gamboa exhibited severe impairment on all measures of language that required reading comprehension, his sight reading, sounding out words ability, was at the fourth grade level, but due to his reading comprehension problems,

distraction measures, or personality could not be administered?

A     That's correct.

Q     And she did the MMPI and the second requirement, sixth grade reading comprehension and Personality Assessment Inventory, PAI, required a reading comprehension which she did not do or invaliditied it; is that correct?

A     Well, she chose the PAI.  That was -- that was -- that's the protocol of hers that I have in my file and that was -- that was considered invalid.

Q     Okay.

A     I re-administered it, however.

Q     Okay.  Now, basically, before we took a break, you indicated that your focus was on the executive functioning; is that correct?

A     That was -- that was part of it.  And in a situation like this, we're also -- we're also interested in personality organization.

Q     Okay.  And let's focus on the executive functioning first, okay, then we'll go to the personality.

A     Okay.

Q     And -- and the -- you mentioned the executive functioning is a prefrontal area of the brain; is that correct?

A     That's correct.

Q    And I think you told me that it occupies about 25 percent of the brain?

A    About 25 percent of the anatomic brain.

Q    Okay.  Now, what are the primary functions of the executive function, what does that control?

A    Well, it -- it controls how adaptive a person is.

THE COURT:  What?

THE WITNESS:  How adaptive a person is.

THE COURT:  Okay.

THE WITNESS:  There's a lot of different components to executive functioning, but, basically, it's like a conductor in a symphony.  It -- it sets the tempo of different processes.

It calls -- it recruits different processes at different times.  It, basically, is responsible for goal directedness, being able to carry through a plan, make a plan, carry through the plans, switch plans if one doesn't work.

The characteristics of people who have difficulties with executive function, no matter what the reason is, is that they tend to go through life in a very simplistic mode and they tend not to handle stress very well and they -- they usually function pretty well in routine, consistent environments, where -- where the boundaries or the rules are well known, but they don't -- they don't negotiate the world

very well, socially.

Q (MR. LANGLOIS) Can decision making and being able to create -- kind of like what we call a career path or something like that, you know, what your goals are and stuff like that?

A Well, by and large, people who have the kinds of deficiencies that we uncovered, they tend to live moment to moment and it -- basically, the executive functioning is really not part of the equation. Their controls are the brakes, behavioral brakes, people who have behavioral brakes, like car brakes.

The executive function is kind of an anology I started off with this morning, is like His Honor, who is very deliberate, but the executive functioning tends to be very slow. If -- if -- if, for example, there was a threat perceived in the courtroom here, there's operations that would take over, and that would be the officers, who would respond very fast.

And by -- and by habit, and this is, basically, what happens with a person like Mr. Gamboa. What happens is that his -- his executive functions are not strong enough to -- to handle a lot of stress and a lot of triggers, but what happens is his priorities flip from -- from -- you know, from whatever it is.

The executive functions go offline as part of their

fight or flight response and then -- but that takes over as -- part of the flight or fight response, the executive functions or memory functions go offline.

So, if there's a threat coming into the room, the officers are going to take charge, because His Honor's in charge of the courtroom now, but if the -- if there's a threatening person coming in, they take charge and they operate very fast, and that's what we want. If the brain is operating fairly normally, that's what you want. You want the fast, stereotypical reflexive systems to take over.

And this is what happens in a -- in a person like Mr. Gamboa. They get caught in a -- in a setting where the emotions, basically, drive the fight or flight response. The executive functions are offline, so the rules, or the brakes, are gone; and so, they -- they tend to make these bad decisions, basically. They tend to react reflexively, without thinking through, without deliberation.

Q   So, does this get into when you talk about the -- the drive and control functions?

A   Drive versus control, yes.

Q   Okay. Now, you have to look at some of the factors, the characteristics, you know, like his stress tolerance; is that correct?

A   That's correct.

Q   And what did you determine about stress tolerance?

A    Well, his stress -- well, there's -- there's multiple factors, but his stress tolerance, as a simple statement, is it's very low. But what we really want to know is what are the triggers, what causes the -- what causes the emotional response, and we have some answers to that.

Q    What are those answers?

A    Well, part of it is wiring, part of it is genetic or what he is born with. When we did our physiological studies, we found that his fight or flight response was about five times normal.

THE COURT:  His what now?

THE WITNESS:  About five times normal.

Q    (MR. LANGLOIS) The childhood --

A    It's the amount of the physiological energy going in, you know, that is -- that is operating all the time. Basically, a person like that, even though they may not perceive to be nervous, because they are habitually at some level, but, basically, there's a basic -- there's a part of their brain that is called the amygdala, that's saying, Go, go, go, threat, threat, threat, all the time and it's sort of like a -- it's as a setting function.

So, when people have this kind of physiological profile, they tend to hyperreact, they tend to go off, like you said, drive, they go off like a rocket, like a two-stage

rocket.

Q    So, basically, he doesn't have much stress tolerance because his executive functioning control is controlled -- is driven by factors that make him kind of overreact to situations?

A    That's -- that's -- that's a way to put it, yes.

Q    Okay.

A    But none of it's simple.  Because, basically, the the -- the stress and tolerance is due not only to biological factors, maybe it's some congenital factors, but also have to do with experiential factors, which are -- have to do with attachment schemes.

Q    Right.  And the attachment, basically, goes to what happens in the early parts of life, you don't have good parenting and other factors like that and you become kind of --

A    Right.  The way -- the way -- if -- if I can just use another anology.  The way the brain kind of works is it works like this:  If I'm walking through the forest, going down to a river and I see a -- a -- something wiggling, you know, on the ground, before the light reaches the back part of my brain to perceive what it is, my -- my physiology is already changing and going into fight or flight response.  My heart is starting to race, my breathing stops, my muscles start getting intense.

And that happens before I actually can perceive -- go over and perceive it and to see that it's this piece of string and not a snake. And this is what happens. See, the emotions are elicited at a pre-conscious level.

Q Okay. So, basically, if somebody is somewhat -- makes a remark towards Mr. Gamboa, or says something to him, normal people will sit there and say, Well, it's not really a threat, but Mr. Gamboa may perceive it as a threat and then react to that threat in a degree far above than what is necessary.

Is that true?

A That's true.

Q Okay.

A That's true.

Q Okay. Well, that goes to -- you know, that's -- his stress tolerance is very low because he's affected more severely by perceived threats or something like that; is that correct?

A Right. That's true.

Q And then, he has a -- executive function goes to a coping style, that he can't cope with that threat; is that correct?

A Because he doesn't have the tools or the resources, he hasn't learned those, yes.

Q So, he can't deal with the stress and he doesn't

have any defensive maneuvers; is that correct?

A    Well, he doesn't have the adaptive ones.  He -- when the person who is emotionally driven, overdriven as this gentleman is, he doesn't have the capacity to put the space of time between the initial -- his initial reaction and his -- and his behavioral reaction.

Most of -- most people can put some time between it and think about it and deliberate and say, Okay.  They didn't really mean to insult me.  But a person with that kind of biological makeup, they don't have that capacity, or it's a lessened capacity.

But there's another part to it, if I may add, is the appraisal part.  Because emotions last about 30 seconds, unless we -- unless we do something or think about something to make them -- to prolong them, and that's the appraisal part.

So, one of the keys -- the reason I say that is what are the triggers, what are the triggers for a person to make them walk like a two-stage rocket.  And so, you have to look at what are the templates, what are the -- what are the appraisal templates that a person uses and those are related and in many people's cases and in his case to the detachment schemes.

Q    So, to kind of give a overview of it:  Low stress, deficient coping techniques, no -- very limited appraisal of

the situation, and then he has an anger management problem. And then, if he does something that is out of the normal scope of what other people would do, that have those factors, that have good executive functioning, so then he's tagged as having an antisocial behavior problem.

Is that correct?

A    The antisocial is by definition.  But the only thing that's interesting is that he may not have a anger problem per se.  It's an -- it's a hyper-reactivity, it's an impulsivity problem.  And most aggression, as it turns out, to violence is impulsive, but -- and that's very true in his case.

All the evidence suggests that that's really the core of the problem.  It's not that he is an angry person.  It's that he doesn't have the capacity to control.  And what happens because of the way his -- he sees human relationships, for whatever reason -- And we can get into that later -- but, you know, instead of quieting down his fight or flight response, his appraisal templates increase, they amplify the emotion because they -- he looks at the enemy, I'm going to get them first, you know.

Q    So, with respect to the situation, we make those observations and that's the character that he's displaying to people, then you go back and you develop, then you determine what the neurological breakdown is; is that

correct?

A    Yes.

Q    Okay.  And does he have a neurological sensitivity, you look at that; is that correct?

A    That's correct, yes.

Q    And you look at his, as you said, emotional accelerators, emotional brakes and a capacity for empathy or developing attachments and also cognitive controls.  Now, those are, basically, regulated by the executive functioning part of the brain; is that correct?

A    That's correct.  It's regulated.

Q    And in his first part, the observations are, basically, his personality makeup and the second part defines whether or not he has any mental deficiencies, is that correct, in the executive functioning?

A    I don't know what the word "mental deficiencies" really means.

Q    Well, is that the drive side?

A    Well, I don't know.  I don't think that's a useful term.  I think I understand the spirit of whatever your question is.

Q    Okay.  What I'm trying to get at is can you explain to the Court -- well, I guess, we have the drive side and the control side?

A    Right.

Q    Okay.

A    Right.  The capacity for rational thinking and deliberation versus --

Q    Now, is the drive side equated to the -- the characteristic or is it related to what the brain is telling you to do?

THE COURT:  Are we talking -- did you say "drive side" or "dry side"?

THE WITNESS:  Drive.

THE COURT:  Okay.

THE WITNESS:  Drive.

Q    (MR. LANGLOIS) You said the drive is kind of like the --

A    The driver's side, yeah.

Q    You said the drive is kind of like a software?

A    Right.  But, again, it's a mix of biological predisposition, plus a person's habits or templates that they develop in early childhood usually.  So, it's a mixture of the two --

Q    Okay.

A    -- where one precedes the other.

Q    Okay.  Now, can you tell us what your findings were that Daneen Milam did not find, regarding executive functions deficiency.

A    Well, she didn't explore those, nor did she look

at working memory, which is also important, but also personality organization. She didn't explore that, either. But we found this gentleman to have significant deficiencies in all areas of executive functioning, practically all areas. Some are quite striking, you know.

There were deficits, in terms of working memory functions, a pattern which suggests traumatic brain injury. The term that they use now is traumatic encephalopathy. He certainly fits that pattern.

His memory function has an organic flavor to it and his personality organization, while it may not be asocial, per se, does look to have the risk of asocial behavior because the emotional controls are deficient, but also his view of human interaction is not adaptive, put it that way, it's distorted.

And kids learn -- let me briefly mention about the experiential side. Kids learn by modeling. They don't learn by -- you know, they don't do what you say. They learn by modeling.

Q    Okay.

A    And it's not only from the parents, but it's from the familial, the friends, peer groups, all these things. That has a big determination, especially in a person with weakenned executive functions. Those things tend to be the real determinants on how a person is going to react in a

particular situation.

Q    Now, you identified these things, and the affect, basically, is emotional -- emotional style and his ability to differentiate the emotional responses.  And I believe you're telling us that they were very low, he has high emotions?

THE COURT:  Can you hold that question for one second?

(Interruption.)

THE COURT:  Okay.  Go ahead.

Q    (MR. LANGLOIS) So, you defined the affect part of the drive side, you identified the --

A    Well --

Q    -- the fact that, you know, his emotional responses were, you know, in high gear at times and that -- and also prevented his potential to organize his thoughts and behavior; is that correct?

A    That's correct.

Q    Okay.

A    The -- it comes from two different directions.  The one direction is the physiological direction.  We know, physiologically, the -- the part of the brain, the medulla are part of the temporal brain, the medulla, is saying, Go, go, go, threat, threat, threat.

The other part comes from more the emotionality, just

his emotions are just his -- it's part physiological, but his emotional -- what we call emotionality, his reactive part is extremely strong.

And then, on the other side of the equation, on the control side of the equation, those controls are deficient. So, you know, the accelerator is strong, you know, the brakes are weak.

Q    Okay.  And on the cognitive side, we call those emotional triggers, is -- you know, you determined his capacity for realistic, logical and constructive thinking and, obviously, that was very deficient; is that correct?

A    This is -- it's not a simple answer.  But to put it most simply is that he -- his capacity -- he has the capacity for rational thinking and emotional being at times, but what the data indicates, what our evidence indicates or predicts, is that he would -- when he gets emotional, his thinking is going to be very fragile and it's going to -- it's going to be not very coherent or rational.

Q    All right.  So, in other words, he does things he shouldn't be doing?

A    Well, part of it because he doesn't -- there's the impulsivity part, but also there's another layer of control where a person kind of looks at foresight or looks at the consequences and the person -- once the fight or flight takes over, then they are not going to be able to have that

foresight or think about consequences.

Q Now, on the control side, you talk about his affect, his coping resources and how he'd cope with things. Now, that's a factor of, obviously, upbringing and, you know, his history and stuff like that; is that correct?

A That's correct.

Q Okay. And there, we had a long history of no parental -- he had no parental guidance, basically, very limited parental guidance, very unstructured childhood?

A Well, that's what Dr. Milam's notes would suggest.

Q Okay. So, basically -- that, basically, went into affect, his emotional containment; is that right?

A A defective emotional containment, yes, that would be exactly right.

Q Now, getting to the executive part, at the upper levels of emotional control, you determined his ability to organize, his cognitive resources to handle frustrating circumstances and his capacities for flexible thought developing hypotheses or verified conclusions.

So, in other words, if a person's out there and he's got these stress factors going on, his capacity to think through the situation is limited; is that correct?

A Yes. It would be diminished.

Q Okay. "Diminished."

And, you know, obviously, it diminishes his attention

ability to suppress the extraneous thoughts and dealing with conflicting information; is that correct?

A    That's technical, but that's --

Q    Okay.  And working memory.  Explain working memory.  Is that something that, you know, you develop as you go through life and -- to make sure that you work in a controlled atmosphere and that you logically work out things?

A    Working memory is like consciousness.  It's not awareness, but it's like consciousness and it's the -- it's the operating space that we're using at the moment, but it allows us to integrate a whole bunch of different information.

But we look at three different aspects of it.  One, we look at the ability -- at the capacity of a person's working memory, how big is the hard drive, so to speak, or -- I guess RAM is a better metaphor for it, what is their capacity, so -- so how long can they sustain information and working memory, which is critically important, in terms of executive functioning.

Q    Did your testing establish that Mr. Gamboa had a very limited working memory?

A    Yes --

Q    Okay.

A    -- woefully working memory.

Q    Okay.

A    But we look at the maintenance of information, the manipulation of information, and then we look at the interference effects of information.

Q    So, all the testing you did was to sit there and determine his deficiencies in these functions; is that correct?

A    Well, we're looking for strengths and deficiencies, but he was -- he was deficient in all areas of working memory. But the more important thing, too, is not a matter of -- is not just an academic exercise in a sense, but it tells us something about what the cause is. And in his particular case, his profile looks like a head injury pattern. It looks like a pattern that we commonly see in a person who sustains a head injury.

Now, when we get a finding like that, we have to go back and we have to look for external validity. Well, he didn't have any -- he had one pretty good bump on the noggin with a baseball bat, but I don't think he was -- the notes -- I couldn't read whether he lost consciousness or not, but Dr. Milam's, when I reviewed her notes, she made some notes on it and I couldn't decipher them. Her handwriting's much better than mine, but I couldn't make out whether he had lost consciousness.

But regardless, when he was -- when he was in middle

33

school, or high school, or junior high, he was in -- he was in fights regularly. And then, he took up -- unfortunately, as a sport, he took up boxing, which is not recommended, you know, because -- so, it's very likely that -- you know, that -- that all the other things that -- as he developed along his cognitive personality and emotional development, most likely he got a head injury factor here as well, which further diminished his capacities.

Q  Now, talking about head injuries -- and I want to go to the behavioral factors under the control side, behavioral factors create a strong bias that he has towards impulsiveness, that is, you know, acting without thinking and inability to express appropriate responses.

Now, would -- you know, I know that recently there's been more emphasis on observing brain injuries, the consequences of, you know, football concussions or boxing and stuff like this, or where people have had multiple -- not very traumatic head injuries, but then repeatedness of those injuries kind of -- kind of creates a situation where it becomes more serious; is that correct?

A  That's very correct, yes.

Q  Okay. And so, are you saying that Mr. Gamboa, at least the test results demonstrated, that he had some type of influence from brain injury?

A  From a traumatic brain injury; that's what the --

particularly, the memory results suggest. There's other indications as well. But the memory results, it was fairly clear that his pattern fits the injury profile.

Q So, all these factors you observed, you know, were, basically, factors that you tested for; is that correct?

A Well, there's evidence for it. We're very data-driven.

Q Does Mr. Gamboa have some type of personality disorder or psychopathic disorder, based upon your examination?

A He doesn't have a psychopathic disorder.

Q Okay.

A He doesn't have a personality -- I mean, psychopathic/sociopathic, in terms of the old definition commonly used, no, he doesn't have that. By definition, he's got the asocial part, but that's by definition.

Q Okay. Attachment, how -- how important is attachment?

A It's extremely important.

Q Can you explain what attachment is.

A The attachment scheme is developed in the first three years of life. So, basically, preverbal, okay, so -- which makes them very difficult to remediate. But, basically, the attachment scheme sets the stage for -- for

telling a person how to interact with the world and whether the world is safe and secure, trusting, or whether the world is inconsistent, potentially hostile or uncaring.

These -- these kinds of templates become -- become the basis of -- in part, morality, but in part -- in large part, basically, how a person engages the world, whether they engage the world with worriness, being hypervigilant, or whether they engage the world as being welcomeing and trusting.

Q   Now, with regard to attachment, do you also look at the children of -- learn by modeling, in other words, parents model their behavior?

A   Children model parents' behavior.  They don't do what the parents say.  They do what the -- what they see the parents do.

Q   Did you determine, based upon his attachment deficits, that he -- Joseph Gamboa is not very trusting?

A   Well, that came through, but his attachment scheme looked to be insecure as a particular type.  Now, it doesn't mean he's got an attachment disorder, but in the context it's an explanatory factor and how -- and to explain how did he get to where he is today.

Q   Okay.  And does he view the world as being hostile towards him?

A   He has to answer that.  But my prediction would

be, yes, to some extent. He doesn't have the same at ease with people that most people have.

Q    What did you determine about Mr. Gamboa's level of empathy?

A    He does have basic empathy. He does have it, so -- we were interested in that because we were looking at issues of autistic kind of behaviors. But he does have the basic empathy. That's why when he put everything -- when you put everything together, we think of his aggression -- the episodes of aggression are not predatory, they're not sociopathic, they're not out of control, they're not repetitive, they're not about pressure.

They're basically impulsive, which tells us, you know, the kinds of settings in which he is going to do well and the kinds of settings in which he would do very poorly.

Q    But while he does have empathy, does he have the capacity to use it?

A    Well, no. The executive functions that are -- you know, they determine how it's used, in large part. Now, a sociopath or a psychopath can have knowledge of -- and they're very good at reading body language and so forth, but they just don't care, you know, where an autistic child is not going to have that capacity, to read the facial expressions, or body postures, or gestures.

Q    Okay. So, where does Joseph Gamboa fit into that?

A     Well, he's kind of like a person who wants to dance, but doesn't know the steps.

Q     Okay.  He's the type of person that what?

A     He's the kind of person that wants to dance, but doesn't know the steps.

Q     Okay.

A     He's got the basic empathy, but he can't -- again, when emotions take over, when a fight or flight kicks in, everything else is sidelined, everything else just takes -- everything else is taken off the list of priorities.  The priorities are survival, either that or tension relief.

(Interruption.)

THE COURT:  Can you hold on one second?

(Recess from 2:01 p.m. to 2:06 p.m.)

THE COURT:  Okay.  We're back on the record.

The class is going to be a few more minutes.  So, as soon as they get here, we'll just put it on pause and let them quietly file in.

Okay.  Mr. Langlois, go ahead.

Q     (MR. LANGLOIS) Okay.  So, basically, we've gone over the executive functioning that controls certain emotions and your ability to, you know, control those emotions and things like that; is that correct?

A     Yes, sir.

Q     Okay.  And what society sees often is a

person's -- commits a crime, you know, commits a murder or something like that, and they translate that into antisocial behaviors, psychopathic behaviors; is that correct?

A    I can't answer that for sure.

Q    Okay. Well, if they do, those are the psychological explanations for them; is that correct?

A    Yes.

Q    Okay. First off is would you determine or be able to classify Mr. Gamboa as a person who would initiate that type of, quote/unquote, antisocial behavior or behavior that results in criminal conduct or a reason that he's here?

A    No. I mean, it's a reflection -- it's a reflection of his character or personality and he's very passive. He's -- he's -- he's a follower, not a leader. He doesn't -- he doesn't initiate it, and we saw that in -- not only behavioralally, but in terms of some of the mental processes. He's kind of slow to get started. It's like he's going in first gear all the time for a long period of time.

Q    Now, I think you found that the evidence kind of argues against a psychopathic personality?

A    Yes.

Q    But that doesn't mean that his personality is not fraught with contradictions or incompatible dynamics by various circles that -- that he kind of acquired during his

development; is that correct?

A    That's correct. And it doesn't mean he has -- his personality development isn't adaptive. It can be adaptive in some circumstances. It's going to be, predictably, very maladaptive in other circumstances.

Q    But his personality shows a heightened -- heightened degree of anxiety?

A    Yes.

Q    Okay. And that anxiety is developed because he doesn't have those trust factors and he feels the world to be hostile?

A    That's part of it. But there's also the physiological -- or, the physiological overdriving is the -- is the -- is the underlying factor of the anxiety.

Q    Which shows lots of breakdown and --

A    It provides the momentum for the anxiety. And that's just physiological. That's part of genetics.

Q    All right.

A    I could just add that, normally, that's a protective factor. People who have that kind of overdriving tend to learn from negative consequences very well. So, when they don't, they wonder why.

Q    So, given the -- the fact that Dr. Milam did not screen the executive functioning portion and, you know, she testified as a mitigating expert, if you were to testify

before a jury, or had the opportunity to testify to a jury at a punishment phase to discuss the consequences of impaired executive functioning and working memory functioning, what would the jury have received from your testimony that they would not have received from Dr. Milam'S testimony?

A    Well, I think by factoring in the executive functioning and working memory personality organization, I think the jury may understand how a person can get to his situation.  I mean, you always seek an explanation why, why this, why that.

Well, it's not a mystery, you know.  In a way, you look at -- you know, if you look at his development from the womb to today, then, yeah, you would say, yeah, the prediction would be that, yeah, he would get in serious trouble.

Q    Okay.  Now, that goes into just being able to explain to a jury the fight or flight response, is that correct, in terms of whether it's physiologically or personality?

A    Yes, sir.

Q    Is that correct?

A    That would be -- that would be part of it.  In this stage of the proceedings, the question is, I mean, could he have made other choices?  Could he have made other choices?

Well --

Q    Well, of course, he could have made other choices, but he doesn't have the capacity to make those choices?

A    That's what I meant to say.

Q    Okay.

A    Because he is limited in a number of choices that he makes and -- and because of the executive functions, he's -- and there's his strong emotionality.  Even the pro social choices that are available to him, he'd probably have a difficult time making.  So, the question is -- is does he really have a choice.

Q    Now, is that what you would explain to the jury, that the implications of a strong fight or flight response in the face of a weak executive and working function -- working memory functions result in being very impulsive?

A    Yes, very impulsive.

Q    Okay.  And so, the display by Mr. Gamboa to be impulsive -- impulsive would cause a person to shoot a person sometimes, would it not, because he's not -- he doesn't have the ability to determine that really, you know, this isn't a fight situation, this is a flight situation or be able to work out the situation because -- but he can't because he has a very damaged executive functioning portion of his brain?

A    Not -- what you say is true, but not all impulsive

people shoot people, hurt people. But, basically, you know, when the fight or flight comes online, the thinking part or the rationality goes offline.

Q Okay. And you said that Joseph Gamboa's not a person who initiates things, or I guess he's not likely to be aggressive. But if he's provoked or if he has that false belief he's provoked, due to a lack of executive functioning, then he does appear to be aggressive?

A Yes. That's a good way of putting it.

Q Okay.

A He's not going to intentionally harm somebody, but -- but he may -- he may take it as an insult, you know, some fairly benine or innocuous kind of statement on the part of someone else. And once that initiates -- that's the appraisal part, and once the appraisal part is -- his appraisal templates just amplify the emotionality.

The initial gut reaction is "huh," and then -- and then the appraisal part just amplifys it and then he -- the fight or flight takes off and he's -- and he starts to fight or, I mean, gets in a fight.

Q That pretty much summarizes what you --

A But he's reactive. That's the point. What you're saying, he's reactive, not proactive. He's not a predator, but, you know, you need to understand how he might get into real trouble.

Q    One of your findings, that you thought was kind of interesting echopraxia?

A    Yes.

THE REPORTER:  Pardon me?

THE WITNESS:  It's E-C-H-O-P-R-A-X-I-A.

Q    (MR. LANGLOIS) Kind of tell us what that is and why it surprised you to find that or what you --

A    Well, it's a frontal lobe sign or a primitive sign and normally disappears.  You see it in children.  It normally disappears by the age of seven.  But, basically, it's very uncommon to find that in an adult.  And why we took such great note of it was because it fits some of the other stuff.  But, basically, it told us about how severe -- severely deficit the executive functions are.

Q    What is echopraxia?  Is it if you look at somebody doing a motion, or something like that, they can't duplicate it?

A    It's the ability to reverse.  If you have a five-year-old child and ask them to do this and use the same hand sign, they will mirror that.  They don't have the ability to reverse it.

Q    Okay.  And Mr. Gamboa doesn't have that ability?

A    Well, he made those errors; that was quite striking.  But also, once you have that, then you can never rely on things.  So, we also found his -- he couldn't

reverse mental images. We would -- did some tests for reversing mental images, doing rotations. That was fairly tough. That's fairly uncommon, to find that in an adult.

Q So, in other words, it's kind of like reading with a mirror and the like, I mean, you can't translate the --

A Yeah. You can't translate. This is doing a rotation, you know. I can imagine what that monitor looks like. If -- if I would sit in front, I would do that rotation in my head, but that's something which is very difficult for him.

And, again, that's very uncommon to find and it sort of adds to the weight of the evidence about having some sort of brain damage. And I hate that term, actually, but -- because it doesn't mean anything. But -- but -- but our results do -- do echo Dr. Milam's results in that regard, she -- the specificity, but she noted he did have some organic brain damage.

Q Now, when you ever -- you do any type of psychological testing that has to do with, obviously, determining, you know, IQ or adaptive behavior or ability to learn or anything like that, like this, is there some type of validity testing to make sure that the person's not creating false answers or just trying to randomly guess or something like that?

Do you do some type of validity testing?

A    Well, we do some -- we do validity testing, but we look at every test individually for -- for consistentcy, for what doesn't make sense. Everything -- everything that a person does is a datapoint for us. Even if the -- if the -- if the results are invalid, it's a datapoint, because you have to ask why.

So, I looked -- looked at -- Dr. Milam's PDI was considered invalid, but if you look at his -- at the sequence of his responses, one of the -- one of the -- one of the hypotheses could be that he couldn't read, didn't understand them, an overhypotheses, though, but that he was highly persevered, because once he started off with a false answer he kept on going. So, there was a string of false answers that was -- that was quite stunning.

Q    So, that kind of established he doesn't really know whether it's true or false?

A    It was an overhypotheses, it has a couple of -- you know, it has implications, but has possibilities. But you look elsewhere to confirm or -- or -- rule in or rule out one of the hypotheses.

But, certainly, we saw high levels of separation on some of the sight tests, but there's no question -- there's no question that reading comprehension is a real -- was a real problem.

Q    Okay. Were you able to validate your test?

A    We were, yes, our tests were validated.

MR. LANGLOIS:  At this time, judge, I'll pass the Witness.

THE COURT:  Okay.  Why don't we take about a five-minute break.

Okay?

You can take Mr. Gamboa out for a second.  We're just going to take a quick break for a second.

Okay.

(Recess from 2:20 p.m. to 2:35 p.m.)

THE COURT:  Okay.  All right.

CROSS-EXAMINATION

BY MS. WELSH:

Q    Dr. De France, my name is Mary Beth Welsh.  We met briefly right before we started.

A    Yes, ma'am.

Q    I have a few questions that I want to go over.  If you don't understand my question, which is entirely possible, just ask me to repeat it or -- repeat it in a different way and I'll try to do that.

A    Sure.

Q    As far as assessment tools for neuropsychology, the Halstead-Reitan is one of many; is that correct?

A    It's one of many.  That's right.

Q    And the Delis-Kaplan is, in fact, one of many,

which is one you use; correct?

A    Well, they sample different kinds of functions, but, yes, you're right.

Q    If you're looking at the tools used -- not looking at what they test, but there's a whole list of tools that are used to assess all kinds of functions, like -- and even in the executive function, the Delis-Kaplan is listed as one of the different tools, as well as the Halstead, specifically, the category test.  And I think you alluded during direct that there was a test on the Halstead-Reitan that does test executive functioning, but you didn't name it.

Were you referring to the category test?

A    No, ma'am, to the Trails B test.

Q    Okay.

A    The category test was actually designed to sample frontal function, but the research shows that it's more of -- it's sensitive to generalized brain damage, moderate to severe.

Q    As a neuropsychologist, part of what you do is determine what -- which of all of these assortments of the tests you're going to use to make your assessment; is that correct?

A    Yes.

Q    And we could have five neuropsychologists in this

room and all five of you may very well come up with a decision to use different tests. Wouldn't that be fair to say?

A   Depending on what were trying to sample, they wouldn't be remarkably different. There might be a lot of overlap. There may be one or two different, but there would be a lot of overlap.

Q   But -- but there's a lot of tools to choose from and you have to assess which ones to choose?

A   That's correct.

Q   Now, in your assessing what needed to be done for this trial or what should have been done for the trial, did you at any time actually talk to Dr. Milam?

A   No.

Q   Did you at any time talk to the defense attorneys that tried the case?

A   The defense attorney?

Q   The defense attorneys. There were two attorneys that tried the case, one of which was in here this morning.

A   Yes. I did. I talked to Mr. Brandon. I talked to --

Q   No. The two -- Mr. Brandon came --

A   He came later. I'm sorry.

Q   -- into this case much later. I'm talking about the trial attorneys.

A     No.  I didn't.  No.

Q     So, you were not aware at -- when you were doing this assessing of exactly what the strategy was of the defense attorneys; correct?

A     That's correct.

Q     You don't know what they wanted to achieve, what they wanted Dr. Milam to look at?

A     That's -- that's very true.

Q     And wouldn't it be fair to say that even -- even you, when you perform tests, could come back now, or even taking Mr. Gamboa's, you could look it and say, Do you know what, we probably ought to do this test and this test and this test that we didn't do before?

A     Well, that's very true.  Because we were -- we were on a time limit.  There were some tests that we would like to have done.

Q     It's true of all of us; right?

A     Absolutely.

Q     In our capacities as professionals, we -- you know, I'll walk out of here this afternoon and say, Man, I could have asked this question, or I should have asked this question, or I should have argued.

We can look back and see where we could have done things differently?

A     That's very true.  I have that experience often.

Q    Yes. In your practice -- you stated in your -- I believe it was your affidavit and even with your listings of your credentials and all, that you had been an expert in a number of legal cases.

Can you be a little bit more definitive?

A    Well, without -- well, there are certain things that I want to talk about, but --

Q    Well, no, I mean, number wise, a number of legal cases. Have you worked on ten legal cases, 15 legal cases, a hundred?

A    Oh, not a hundred, no, because I don't do this for a living. Probably -- probably 20. I've been doing more and more recently, but I have been involved -- I don't want to get too much in detail, but -- but I've done some capital cases and did some sexual predator cases.

Q    So, of the number of legal cases, how many -- and, again, I'm not asking for any detail. What those legal cases are is really irrelevant here.

A    Yeah.

Q    But what I want to know is how many of the cases you have been involved in are actually criminal cases.

A    I'd say a dozen, talking about serious felony cases.

Q    At the time --

A    And I'm not talking about drug arrests and stuff

like that.

Q    Okay.  At the time that you, I believe, did your affidavit and you got your credentials, you had stated you had direct involvement in a capital case for the State.  Is it one capital case you have been involved in or is there more and some were for the defense?

A    Well, no.  I have done -- I have worked for the prosecution and defense -- for the prosecutor.

Q    And how many capital cases did you do?

I guess I shouldn't say that you do.  How many have you been an expert for?

A    Oh, gees, it's probably -- Oh, boy.  It's probably -- I'd say six to eight, something like six or eight, six capital.  I've done a couple of -- for the prosecution.  I've got a couple ongoing.

Q    Well, you just -- you just made the statement, which is going to lead sort of to my next question, that it's not what you do for a living.

A    That's correct.

Q    In fact, yours is a clinical neuropsychology and that's what --

A    Well, I'm a -- yeah.  I'm a clinical neuropsychologist, but I have -- I see patients of all age groups, children, adults, adolescents.

Q    So, I don't see anywhere in -- in your

credentials, which, by the way, they are -- I'm not questioning your expertise. However, I, in my studies, have seen that forensic neuropsychology has become a specialty where the neuropsychologist actually spends time and focuses on the legal aspects of the nuances of what they are testing for.

Is that fair to say?

A     Well, not quite, but that's -- I understand the sense of the question. The -- yeah, you know, in the last, say, six years, there's been -- there's been some attempt at getting special -- doing specialties in forensic psychology. And I will say in my own defense that I have been trained, of course because I've had a lot of CEUs.

Q     Okay. It's not a defense. Again, I'm not questioning your expertise. I'm just looking at the fact that -- are you familiar with the -- a forensic clinical neuropsychology textbook?

You're familiar with those kind of textbooks; correct? And this actually --

A     Well, there's a number of them.

Q     Okay. This one -- I'm sorry. Let me rephrase that because it'll be more specific for you. It's *Applied Clinical Neuropsychology*, 2011 copyright (indicating).

A     I don't think that's in my library, but I've probably got equivalents. I mean, there's a number of them

out there.

Q   And they talk about forensic clinical neuropsychology, where they specialize in the forensic application of your knowledge and skill.

A   Well, I -- well, I do have some of those books in my library, but I try to stay current with the literature, too, because, like, over the last four or five years I have been doing more and more of these kinds of cases, so --

Q   Well, bottom line, with the forensic, in dealing with the legal aspects or the nuances -- in fact, she -- they talk about in this -- in this book, that, in the forensic setting, many other issues, other than just the -- the clinical issues, surface, such as -- one of the big ones is mallingerring and some of the things that will affect -- for example, you didn't evaluate Mr. Gamboa until he was on death row for nearly a year versus her, as in Dr. Milam, evaluating him during the trial.

That could -- that could bring some nuances and differences; correct?

A   Well, that's very true.  But let me say this:  I have had a lot of experience in evaluating for mallingerring.  Because most of the legal cases we have done have been in civil court, they have to do with injury and there malingering is a real issue.

But I will say, too, that we -- we pay a lot of

attention to internal consistency and, eventually, the external consistency doesn't make sense, so -- but we evaluate everything, in terms of level of effort and we evaluate everything -- every test, in terms of authenticity of effort. That's really a major -- a major point for any kind of evaluation. So, we spend a lot of time with that.

Q And the bottom line for my point is you, as an expert, or Dr. Milam as an expert, it's important to understand within the legal setting exactly what needs to be obtained, exactly what the defense attorneys want to convey to the jury; correct?

A That's -- that's true.

Q And it may be part of their decision process as to whether or not they want to put on the technical stuff that we heard for an hour and a half, which I'm not questioning, is not -- it's probably very valid and there's no denying that he had a horrible childhood, but they have to decide what impressions the jury's going to be left with, are they going to -- are they going to listen to his family, give this heartwrenching background of how horrible his life was, or are they going to want more technical stuff.

Do you see what -- it's a decision-making process, do you understand that?

A Well, I --

Q "Yes" or "no"?

Is it a decision-making process the defense attorneys have to do when they are trying a case?

A     Well, in a sense -- well, of course, it's the -- the attorneys are the -- they are sort of the quarterback.

Q     Well -- and they have to decide whether they want to go into more detail in one area or get on the -- the -- that he's brain-impaired and he suffers from this terrible childhood, that nobody denies or what to do, it's a decision; correct?

A     Yes.  It's their decision.

Q     Now, you did speak a little bit -- first of all, when you were getting preparing for this and you were talking to -- or, evaluating Mr. Gamboa, you mentioned that you looked at Dr. Milam's -- I'm not sure if you actually just looked at her notes or did you actually read the record?

A     I didn't get what I have in my file.  This is -- this is my file for him.

Q     Okay.

A     What I have in there, I did not receive until -- her work, I did not receive until I finished the evaluation and started writing the report.

MS. WELSH:  May I approach --

THE WITNESS:  I did --

MS. WELSH:  Hold on just a minute.

Your Honor, may I approach?

THE COURT: One at a time -- You can approach -- so the Court Reporter can get it down.

Q (MS. WELSH) This is my copy of the record, but I just wanted you to look -- do you remember looking at anything that was -- looked like this, like it was a record or transcript (indicating)?

A Yes. Well, yeah, I think I did.

Q Okay. Well, you were flipping --

A That was -- that was for --

THE COURT: Hold on a second. One of you at a time. Let him finish if he is talking.

Q (MS. WELSH) You were talking of her notes and then you said "deposition" a few times, so I just wanted to clear up for the record that you actually did look at the record, that you got the record.

A I don't recall -- I don't recall whether it was a deposition or a court recording. I didn't review that before we did the evaluation. I didn't review all her -- her details of the family history and her actual test results until we were, essentially, completed, because I was -- otherwise, I would have designed the tests -- the battery of tests a little bit differently, but -- but, anyway --

Q Which, again, brings us to the fact that you

looked at what she did and then you can decide to do more or different testing, which is very -- it doesn't mean she was wrong, it just means you could add to it; correct?

A    No.  I never said that she was wrong, because our testing -- our results, basically, complement each other and we both say the same things, in terms of -- in terms of the summary.

Q    When you reached your conclusions on Mr. Gamboa, had you read any of the police reports having to do with this particular offense that he was on trial for?

A    No.

Q    Had you talked to Mr. Gamboa at all about this offense?

A    I don't do that.  They tell you.  I don't ask any questions about that as part of -- never -- never ask a question about that.  Now, they tell you.  Along the way, we have notes.

Q    Did Mr. Gamboa tell you anything about this offense?

A    I have some sketchy notes, but --

Q    What did he tell you?

A    Well, he said he didn't do it.

Q    Okay.  Did he say who did it?

A    Well, that's all -- basically, from --

Q    No.

"Yes" or "no"?

Did he say who did it?

A    Well, no, not -- not definitely, but there was -- but -- that's to me, that's hearsay and I don't --

Q    Well, it's not hearsay because it was coming from him and we are allowed to ask questions about what he said.

A    Right.

Q    So, did he offer who might have done it, if he didn't do it?

A    Well, there are some names and I can show you the names, but I don't --

Q    And they were?

A    I can show them to you, but I --

Q    You can't just say them?

A    -- I don't want to -- Pardon me?

Q    You can't just say it?

A    I'd rather not, but I can show -- no, I can get --

THE COURT:  Well, here's how it works.  If he told you -- unless there's an objection, if he told you who did it or anything that he said to you is fair game in this proceeding, unless there's an objection.

So, you can go ahead and testify as to what he told you or -- about who did it.  I don't think there's any --

MR. LANGLOIS:  Your Honor --

THE COURT:  I think it's fair game, unless

there's some legal objection to it.

MR. LANGLOIS: I don't know what discussion he had. I thought he already told him that -- he didn't go into anything about the facts of the case and that's pretty much the answer.

THE COURT: Well, I think his answer was that he was told who did it and he had some names and he didn't want to answer it and -- because it was hearsay. And, quite frankly, that's not his call.

I think he's -- there's not any reason why he can't answer her question as she has posed it, unless, number one, he didn't tell him or, number two, he doesn't know.

THE WITNESS: I'm sorry.

THE COURT: Okay. So -- so -- and there's not a need to show it. I mean, if you've got a document in front of you where he said who else did it, then you can answer that question.

THE WITNESS: I'm sorry, but I don't think -- if I said that he said who did it, I think I misspoke.

THE COURT: I'll tell you what: Let's start over. Ask your question again.

Q    (MS. WELSH) When you were speaking with Mr. Gamboa -- I'll ask both questions again -- did he ever -- what did he tell you about whether or not he committed the crime?

60

A    He denied doing the crime.

Q    And in denying doing the crime, did he tell you who did the crime?

THE COURT:  That just calls for a "yes" or "no" at this point.

THE WITNESS:  Well, what level of -- Okay. Your Honor, what level of certitude?

Well, I would have to say, you know, my -- my interpretation, no.

Q    (MS. WELSH) Okay.

A    He gave a name, but I --

Q    Did Mr. Gamboa suggest to you other individuals, by name, that may have been involved with this offense that he did not commit?

A    I think -- yes.  There were some --

Q    And those names were?

A    -- there was some conjecture, but it's -- it's conjecture.  Look, I'm not -- I wasn't part of the police investigation and that's not -- it wasn't my job.

Q    Okay.  Dr. De France, the point is perhaps you're making it without even giving the names.  The reason the defense attorneys oftentimes do not expose their clients to this type of evaluation is because they talk and they give information that may come back to hurt them.

Do you see that?

Do you agree with that?

A    I agree with that.

Q    Okay.  So, the defense attorneys, in making their decisions on what -- how in-depth they go and who is evaluating their client, that all comes into play because the clients talk; correct?

A    The clients talk, yes.

Q    Okay.  And he told you he didn't do it.  But did you see any other reports on -- of the other offenses that he committed?

A    I -- I heard about them, but I didn't see any reports.

Q    Because you've talked in terms about Mr. Gamboa being reactive, perceiving threats and -- in fact, I think in your -- your -- you talk about he would be rather passive and feels comfortable in structure and routine.  Those were your words in your affidavit.

Are you aware that, on June 25th of 2005, which was right about the same time of this capital murder, that Appellant was just hanging out with a buddy of his, found some bullets for his revolver, put the bullets in it -- This is testimony straight from the trial record, so I'm not going on anything that -- it's not conjecture -- (reading) He put some bullets in the gun, put the gun in his pocket and told his friend to start his car, which his friend did

because he thought that Gamboa might shoot him.

(Reading) They drove to an area -- by the way, Appellant told the guy where he wanted him to go. They went to the Prime Time Bar, Appellant got out, started talking to some people and then just started shooting. He did the same thing at a gas station, no apparent threat, no -- he went up to the people with the gun.

(Reading) In fact, there was one incident where Appellant saw a Corvette and said he was going to jack the guy, he told his friend. Appellant saw two girls and asked them to pretend to be prostitutes, so that the guy would stop, but the girls refused.

This doesn't sound like a person reacting. He sounds like he's -- he's planning something, he wants that Corvette and he has a plan to get it.

Wouldn't you agree?

A    Well, I'm not familiar with the -- those scenarios.

Q    Those -- that's not just a scenario, sir. Those were facts --

A    Well, they may be.

Q    -- that came out at trial.

A    They may be, but you're asking me to comment on it. The -- I don't think that's totally inconsistent with -- with our findings, but our findings are pretty clear

that he tends to be more passive than being proactive.

Q    So, in the facts of this case --

A    But I can't speak -- I can't speak to the facts and the circumstances.  That's why when we do these evaluations -- I mean, we're not the judge or the jury.  I mean, we don't determine guilt or innocence.  What we are asked to do is provide information to the court.

Q    Well, in fact, that brings -- you talked about you're there to ask -- answer the question "why" and we've done studies --

A    Sure.

Q    -- throughout history trying to understand why, right, why people do bad things --

A    That's true.

Q    -- right?

A    Absolutely.

Q    And as a society, would you agree that it makes us feel better sometimes to think that there's some reason that a person is committing crimes, other than they are just flat out mean?

A    I would very much agree with that.

Q    You talked about him being good in organized settings or he would be passive.

Are you aware that, in December 14th, 2007, shortly after being sent to death row he assaulted one of the other

inmates with a spear that he made himself?

And this is not out in general population. He pushed the spear through his -- the hole in his door, in his cell, to try to attack this person, unprovoked, he's in his own secure cell, he modifies whatever he can come up with and makes a spear, so that he can stab someone and then flushes it down the toilet.

Were you aware of that?

A     I was aware of the -- of the event, but I don't know the particulars of the circumstance; so, I'm not sure what you want me to comment on. I mean --

Q     I am just stating that he is in prison now, he is on death row, he is in a very secure situation, he shouldn't -- if he's as passive as you say he is, then on 11 -- November 21st of 2008, he assaulted an officer.

On January 11th of 2009, he assaulted an officer, again with a weapon that he made, 12-inch piece of rolled up newspaper with razor blades attached, that required treatment beyond first aid.

Again, he stabbed through the slot in his cell door, so nobody's even safe to walk by his cell, and then he flushed it down the toilet, so that no one would find any evidence of it.

January 30th of 2009, he assaulted an officer by throwing a homemade spear. He likes to make weapons,

apparently, because then he flushes them, so he has to remake them. So, he made another weapon and he attacked the officer as they tried to remove him from the day room. He speared him in the leg.

February of 2009, he possessed a weapon, intended to injure, again something he made, rolled up -- paper rolled up, with a piece of metal four inches in length, attached to the end and sharpened, so -- and the list goes on, I might add. I mean, it's -- it continues to go on, which seems to suggest that even in the prison environment he's not necessarily going to be passive and he --

A     Well, I think -- I think the point that Dr. Milam made and our data suggests or indicates that he's going to do best when there's a lot of routine and consistency and where things are simple, but he's going to be reactive, not going to be proactive.

Now, I don't know the circumstance for those things. I believe what you say, because I'm sure it's documented, but I think you need to look at the motive, if there was -- if something was triggered in this gentleman.

I don't know. Now, I -- and nobody -- nobody is claiming that he's a saint, that all of his behavior has been exemplary and nobody's saying it's excuseable, okay, but what we are trying to do is figure out why.

And like you were asking, we want to know why, because

it makes -- it's helpful. But more than that, it's -- it comes down to the basics that says what is his level of -- of blameworthyness.

Yes, he may have done some of those deeds, but if we look at -- if we take his behavior and look -- take a broader view of it, if we understand it, then maybe we can -- it's not to excuse it, but maybe we can see another way for justice to be serveed.

Q Do you see how statements like lack of adequate controls -- let's see, I think you used some statements like -- I can't find them -- basically, that he had no impulse control.

Do you see how that could be -- no doubt -- Here we go, (reading) No doubt he would have been acting reflexively, without regard to the consequences; he has -- doesn't have the ability to understand those consequences; he has total lack of control.

Do you see how that might come across as or be a two-edged sword when it comes to deciding what to put before a jury?

A Well, I think -- I think that's -- that is a fairly accurate reflection of the situation. I don't know all the -- the jury needs to make their own decisions, but that's the -- I think that's -- reflects the facts of the -- of the situation.

Q Well, the fact that it's a two-edged sword, meaning that somebody could look at that and say, Oh, poor thing, let's give him a break, somebody else could look at it and say, Oh, my gosh, this person's got to go, he's a total danger --

A Absolutely.

Q -- those are things that the defense attorney has to weigh; right?

A Well -- and we weigh, too. Because when we do these things -- I'm going to digress. The one place where I've got to disagree with Dr. Milam is we do make risk assessments, because public safety is an important issue. And not everybody likes to hear what we have to say, in terms of defense attorneys, about -- about their clients, but it is a two-edged sword, definitely.

But if there is -- if there is a history of unprovoked assault, then that needs to be handled and controlled --

Q Well --

A -- but that's not -- all we're -- all we're doing is -- is -- when -- when people -- people have different styles of -- varying styles of the way that they handle things, and that's what we are -- that's what we're testing, in part.

We're testing trait factors, in part, but sometimes we're testing these trait factors, that there are -- there

are predictable ways of responding, and that's what Dr. Milam and I were looking at, in part.

We are making our judgments, our conclusions, about how they respond in a -- in a prison environment, based upon those kinds of traits. And the literature shows, I think, that the level of service -- you know, it helps us determine the level of service, that, you know, he should do best in a -- in a controlled setting, but we are not saying that he would be doing well to be released --

Q    I'm going to say, if that's his best, then we're in big trouble; right?

A    Well, I think we need to know the circumstances, with all due respect. There's more to the story.

Q    Well, with all due respect, he is in his cell, he has fashioned a dagger or a spear and he reaches out to someone that is crossing by his cell door. That's the facts.

A    But that's --

MR. LANGLOIS:  Judge --

THE COURT:  Hold on a second.

Mr. Langois?

MR. LANGLOIS:  -- we are getting into the punishment phase of the trial. This doctor, you know, talked about executive functioning and how it affects a person. It has nothing to do with the behavioral, and we

are past things like that.

He never testified that he wouldn't do anything. He just explained exactly -- you know, based upon his brain damage and stuff like that, at how that affects certain things, having the controls, affect and stuff like that.

All this testimony here is just not even relevant --

THE COURT: Okay.

MR. LANGLOIS: -- to this Hearing and I would object to it --

MS. WELSH: Your Honor --

MR. LANGLOIS: -- if she wants to make the point, you know, he did this, those are things up in TDC. That has nothing to do with how his brain is functioning; that's all.

THE COURT: Okay.

MR. LANGLOIS: If she wants to be -- certify herself as an expert, that certainly has more authority and more knowledge than our doctor does, then she should get up on the stand and take it.

But, you know, the questions relate to whether or not these studies were valid and whether or not the executive functioning is something that the jury should have heard. That's the whole thing, not what he's done up in prison, you know. That would go to, you know, future dangerousness and we are not into that area.

MS. WELSH: May I respond?

THE COURT: I'll give you a little latitude on that, just tie it into his expertise, rather than just questioning him on whether or not he knows it happened.

MS. WELSH: Well, I --

THE COURT: That's my ruling, so you can continue your questions.

MS. WELSH: I actually don't have that much more on that.

THE COURT: Okay.

Q     (MS. WELSH) The -- the bottom line being that in your affidavit that you did talk about whether or not he would be -- do well in these settings and -- and Dr. Milam did the same thing, talked about the same thing; correct?

A     That's correct.

MS. WELSH: Your Honor, at this time, I would like to offer into evidence the prison records, just because I had referred to them, just so that they are part of the record.

You have the originals along with the business affidavit in the court's file. I filed them and gave notice. Just because I did refer to those incidents, they will be part of the record.

THE COURT: Okay. Is that -- it was file stamped the 9th of April?

MS. WELSH: It's -- it's in a manila envelope, yes, sir.

THE COURT: Okay. Mr. Langlois, any objections?

MR. LANGLOIS: Judge, I don't understand the relevancy of those criminal records. It has nothing to do with this. This is not a punishment hearing.

THE COURT: Okay.

MR. LANGLOIS: It has to do with whether or not -- you know, the issues that I raised in the Writ. I don't understand why she is bringing that in. It has nothing to do with it. It's post-trial.

The whole issue here is what happened at trial, whether or not Mr. Gamboa received the effective assistance of counsel and whether or not there was, you know, testimony that should have been provided at that time.

I don't see anything that happened after the conviction that is relevant in this case and that's exactly what those reports are about.

THE COURT: Okay. Is there an exhibit number on them or are they just part of the --

MS. WELSH: No. I need to have them marked.

THE COURT: Just so I can rule on that.

(State's Exhibit No. 1 marked.)

MS. WELSH: And, again, the purpose that the

State is offering those is simply because I did allude to them, based on the doctor's affidavit on what -- kind of how he would be in controlled situations, and I'm going to move away from that at this point.

THE COURT: Okay. Here's my ruling: For now, they are admitted. When you submit your proposed findings of fact and conclusions of law, quite frankly, they would be relevant and admissible only as it goes to his testimony and how he reached his opinions about the Defendant, not as to any issues of future danger or about his conduct in prison, so --

MR. LANGLOIS: He never testified about his future dangerousness, your Honor.

THE COURT: That's what I'm saying. So, my point is they are only relevant to the extent that he has interviewed the Defendant, he's testified about his functioning. And so, I don't -- I don't believe, at this point, that they are relevant to any issues of future danger in prison.

So, quite frankly, I'm going to let them in. I don't know how they are really going to factor into any proposed findings of fact and conclusions of law. Now, you can submit them to me, I'll -- I'll consider them, and then you can make any objections on those proposed findings that you want.

I'm just going to allow them in, only because he's referred to them a couple of times and he's aware of them. Okay.

MS. WELSH: And, again, your Honor, just because I referred to many of the incidences that are in there, that's just to show that I wasn't making something up --

THE COURT: Correct.

MS. WELSH: -- that I had it on paper.

THE COURT: Correct.

Q    (MS. WELSH) Just a few final questions and then I'm finished. When you were reviewing things for your evaluation of Mr. Gamboa, as well as testifying here, did you review any findings made by a Dr. Gilbert Martinez?

A    No. I did not.

Q    Did you see any reports or any findings made by a Nadine Maz?

A    No.

Q    Did you talk to any people that know the Defendant but aren't his family?

A    No.

Q    In fact, from what I gathered from you, really, you're concentrated on your testing and -- and him pretty much. Is that fair?

A    That. And Dr. Milam's file, yes, that's true.

MS. WELSH: Pass the Witness, your Honor.

THE COURT: Mr. Langlois?

REDIRECT EXAMINATION

BY MR. LANGLOIS:

Q    Dr. De France, you were questioned by the prosecution over the issue of who made the decision to decide, you know, what was going to be presented at trial and, obviously, you had -- weren't even concerned with what happened at trial; is that correct?

A    That's correct.

Q    All your involvement in this case has been post-trial?

A    That's correct. Yes, sir.

Q    Okay. And you were asked by Mr. Jay Brandon, who was the original Writ lawyer for Mr. Gamboa, to evaluate the executive functioning; is that correct?

A    That's right.

Q    Okay. And executive functioning, basically, is a consistent factor, is it not?

A    It is.

Q    Okay. And it has -- it is a determination of whether or not there is brain damage or brain impairment; is that correct?

A    Well, those are separate questions in a way, but we found that -- deficits of executive functioning, some of

which could be developmental. But we found evidence, too, that it looked like it was actual acquired brain trauma.

Q    And your evaluation established that Dr. Milam certainly did some thorough testing; is that correct?

A    Yes. I mean, our -- our testing actually agrees with hers. The issue -- the issue is that she -- she didn't explore some critical areas that should have been explored.

Q    And that was your -- and that was your determination, that there's other areas, particularly the executive function area, that she did not cover in her testing?

A    That. And personality organization --

Q    Okay.

A    -- and a working memory, yes.

Q    And based upon that, that evidence likely would have benefited the jury in making their decision on mitigating factors; is that correct?

A    Yes.

MR. LANGLOIS: Okay. No further questions.

THE COURT: Anything else?

MS. WELSH: Nothing further, your Honor.

THE COURT: Okay. Can he be excused to go back to --

MS. WELSH: Yes.

THE COURT: -- Houston or Maine.

THE WITNESS: I'm going to Houston, sir.

THE COURT: Okay. Doctor, thanks again. I appreciate it.

Anything else, Mr. Langlois? Any other witnesses?

MR. LANGLOIS: Not at this time, judge.

THE COURT: Okay. State?

MS. WELSH: Nothing, your Honor.

THE COURT: Okay. Any other evidence I need to consider? I know there was some rumblings about an affidavit that was mentioned yesterday. Do you have another expert that could not be here --

MR. LANGLOIS: Yeah, Dr. Weaver.

THE COURT: Okay.

MR. LANGLOIS: At this time, judge, I'll offer into evidence -- well, it's evidence -- his affidavit's been submitted with the Writ and ask the Court to consider that -- or, within the Court's power to consider affidavits in the use of findings of fact and conclusions of law, if it becomes applicable.

THE COURT: Anything from the State?

MS. WELSH: Yes, your Honor. The affidavit is attached to the Writ, which simply makes it -- supports the Writ and perhaps gets him in a hearing; however, we are now in a hearing and the affidavit is in violation of the rules of evidence. It's hearsay, inadmissible and we object

on that basis.

THE COURT: Okay. Let me just ask the parties real quick: I understand, at least in a proceeding like this, that the rules of evidence, typically, apply that an affidavit, although it's sworn to, would not afford the opposing side the opportunity to question or cross-examine the affiant in that matter.

Mr. Langlois, any -- any response to that, that it's just been attached to the Writ?

I know it's common that affidavits are attached, which kind of gets us into court.

MR. LANGLOIS: I believe that, while the rules of evidence do apply at the hearing, the judge can also, you know, regulate or have the discretion to allow affidavits and -- and the testimony.

THE COURT: Okay.

MR. LANGLOIS: My position is that I think that they are admissible if the judge, you know, allows them to be considered.

THE COURT: Okay. Let me just make --

MR. LANGLOIS: Certainly, the State has a right to file an opposing affidavit to his affidavit and they did not.

THE COURT: Let me just make this ruling on it: Before we formally rest and close on this, I'll give

the State the opportunity to file any opposing affidavit, if they feel it's appropriate.

Alternatively, I think it's already part of the Writ, so it's there for consideration. What I will do is e-mail each of the parties. If I have any concerns about the affidavit or any questions about it, I'll advise the parties. And if the State, at that time, chooses to file an opposing affidavit, they can. Or, rather, than resting and closing today, if my position is -- is that the affidavit is sufficient for consideration based on the content of it, or my review of any case law that relates to that, I'll advise both parties and just come back and hear what that witness has to say, if, in fact, you want to put him on.

So, I'll just -- I'll let you know within the next few days how I'll proceed on that and then if, for some reason, the State feels like it's appropriate to just file an opposing affidavit, if you'll just let me know how long you need to get somebody to respond to that, I'll give you the time to do it.

I'll have the Court Reporter go ahead and prepare the record, based on everything we have done so far, and at least we can kind of get things going and you can get your proposed findings of fact and conclusions of law ready, or just anticipate doing those as soon as Angie's done with the record.

Let me make it real clear on the TDC records, I don't think this Hearing was about future danger. It was more along the lines of mental issues involving the Defendant; so, those records are being admitted not to establish that the Defendant is a future danger, but simply to support the State's position that Dr. De France either reviewed them or, had he not reviewed them, that the representations made by the State were accurate in the cross-examination of that witness, not in supporting any claim that, in fact, the Defendant's a future danger, so that the death penalty was valid in this case.

Anything else that needs to be brought to my attention, Mr. Langlois?

MR. LANGLOIS: Not that I'm aware of at this time, judge.

THE COURT: Okay. All right. Ms. Welsh?

MS. WELSH: The prosecution does not present themselves as an expert in any type of neuropsychology, just for the record.

THE COURT: Okay. So, what I'll do is I'll advise -- I'll advise each of the parties, probably within -- I may be able to do it tomorrow, since I had planned to be here tomorrow to just do a little research on the affidavit, I'll review it.

If I'm uncomfortable with the content of it, or if I

just decide, Hey, it's all fair game, I'll let you know. If you want to -- if you want to file an opposing affidavit, everybody just gets a copy of the e-mail, just let me know how long you think you'll take.

If -- if I feel that it's appropriate just to exclude it and you want to bring in that expert, we can cross that bridge on another day.

Okay. Anything else?

MS. WELSH: No, your Honor.

THE COURT: Okay. Mr. Gamboa, do you need to talk to Mr. Langlois for anything?

THE DEFENDANT: No, sir.

THE COURT: Okay. Take care of yourself.

Okay.

**P R O C E E D I N G   C O N C L U D E D**

THE STATE OF TEXAS        )

COUNTY OF BEXAR          )

      I, ANGELITA RANGEL JIMENEZ, Certified Shorthand Reporter in and for the County of Bexar, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

      I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

      I further certify that the total cost for the preparation of this Reporter's Record is $_____ and will be paid by THE STATE OF TEXAS, COUNTY OF BEXAR.

      WITNESS MY OFFICIAL HAND this the ____ day of _____, 2013.

      /s/Angelita Rangel Jimenez
      Angelita Rangel Jimenez, Texas CSR 6016
      Expiration Date: 12/31/14
      P.O. Box 680665
      San Antonio, Texas  78268
      Phone:  (210) 288-0312
      E-mail: Srradj@sbcglobal.net
Court Cause No. 2005-CR-7168A-W1, Ex Parte:  J. Gamboa
Vol. 5 of 6, 4/24/2013

# *Certificate*

THE STATE OF TEXAS     *

COUNTY OF BEXAR

     I, **Donna Kay McKinney,** Clerk of the 379TH Judicial District Court, in

and for Bexar County, State of Texas, do hereby certify that the above and foregoing are

true and correct copies of all the proceedings had in the case of

**EX PARTE:  GAMBOA, JOSEPH 2005CR7168A-W1**

**HONORABLE BERT RICHARDSON  PRESIDING** the same appear from

the originals now on file and record in this office.

     **GIVEN UNDER MY HAND AND SEAL** of said Court at office in the City of

San Antonio, Texas, on this the 6TH day of   JANUARY, A.D., 2015.

                         **Donna Kay McKinney**
                         Clerk of the District Courts
                         Bexar County, Texas

By _____
       JAMIE L. OSIO
       DEPUTY DISTRICT CLERK

**\*\*\*\*\*\*\*\*\*\*\***